White, J.
 

 delivered the following opinion.
 
 *
 

 In the examination of this case, counsel have investigated one question only, and that is, whether the circuit court erred, when they instructed the jury that a grant founded on a military warrant, ought to prevail against a grant issued under the laws of Tennessee, when we have no information on what species of warrant such grant issued: the bill of exceptions shows these facts, that the tract of land in dispute, lies about one and a half miles east of the military boundary line, as run by public authority; that Puckett claimed title by
 
 *336
 
 virtue of a grant founded on a military warrant, issued by the state of North Carolina, in the year 1796, to Donelson and Tyrrel, and by a regular chain of mesne conveyances from Donelson and Tyrrell to himself.—That the defendant Lydia claimed title by virtue of a grant, issued by the state of Tennessee in the year 1811 to himself. That the circuit court instructed the jury, that Puckett’s title, thus derived, ought to prevail against that of Lydia. To these instructions exception was taken by Lydia’s counsel, and the cause removed into this court.
 

 By the laws of North Carolina, a certain district of country was set apart, within which, military warrants were to be satisfied; under those laws, no authority is given to have a survey made, or a grant issued upon a military warrant, out of this district, until all the land within it, fit for cultivation is exhausted; it is not pretended, and in truth cannot be, that in the year 1796 when the grant to Donelson and Tyrrell issued, that this contingency had happened.— We do not know that it has yet happened; it certainly had not, when Tennessee acquited the right to perfect titles,
 
 (a)
 

 Under our former judiciary system, the case of Goodloe’s lessee vs. Wilson,
 
 (b)
 
 was investigated in the superior court; the plaintiff's grant was the eldest, and founded on a military warrant; the defendant’s was founded on a warrant issued by John Armstrong
 
 ;
 
 the land lay a short distance south of the military line, as run by the public authority
 
 ;
 
 but Goodloe endeavoured to prove, if the line had been correctly run, the land would have laid north of it. The court determined— First, that the line as run and marked by public authority, should be considered as the true line. Second, that the grant founded on the military warrant, was void when opposed by one founded upon a warrant from J. Armstrong's office.
 
 I
 
 then believed and still do, that the opinion of the superior court in that case, was correct.
 
 (c)
 

 The counsel who have argued this case for Puckett, state, they are willing to suppose the determination in the case put, correct, and yet insist, the military grant in this case, ought to be considered good for various reasons.
 

 First, it is said, here, we do not know on what species of warrant Lydia’s grant is founded
 
 ;
 
 it may be a military warrant as well as that of Puckett.
 

 To this, it has been answered, and I am of opinion correctly, that it matters not, on what kind of warrant the grant to Lydia issued. That, after this state obtained, by virtue of the compact who North Carolina, the right to perfect titles on unsatisfied claims, she, by her laws devised a plan, by
 
 *337
 
 which to ascertain what existing unsatisfied claims for land, were fair claims against North Carolina : and that whenever her commissioners adjudged Lydia’s warrant a fair claim against the state, the laws of Tennessee authorised a grant to be issued upon it, as well out of, as within, the military boundary, and this,whether it was a military warrant or not; that as Lydia’s grant issued under the laws of Tennessee, those laws authorised the issuance of it, be the warrant on which it is founded of what species it may. That the foundation of the decision in the case of Goodloe and Wilson, was that the laws authorised the issuing Wilson’s grant, but did not authorise the issuing the one under which Goodloe claimed, and therefore Wilson prevailed.— That in this, the laws authorised the issuing Lydia’s grant, but did not authorise the issuing that to Tyrrel and Donelson; and therefore the former ought to prevail.
 

 Again, it has been argued, that as the laws of Tennessee authorise the obtaining a grant upon a military warrant, for land out of the military bounds, why compel Puckett to draw a new warrant ? Why not permit him to hold the very land, which he might now, save for Lydia’s claim, obtain a grant for ? This argument is very plausible, and at first had very considerable influence on mind: but upon reflection, do
 

 not think it of much weight. The argument takes for granted, that which might never happen. Should Puckett apply to the commissioners for a new warrant or certificate, he might not be entitled to one; his grant may have been issued upon a warrant, which had been previously granted, and therefore, he would under the laws of Tennessee, have no fair claim to another. If, for the sake of convenience and the saving of expence, we permit such grants to hold, upon a supposition that they issued upon fair claims against North Carolina, and that the grantee or those claiming under him, ought to have that quantity of land, we might in some cases be mistaken; because, such grants may have been issued upon warrants satisfied several times before, and therefore, nut requiring under our laws any further satisfaction.
 

 It has been also urged, that as no provision is found in the acts of 1806 or 1807, which would authorise Puckett to file has grant with the commissioners and obtain a new warranty we ought to offer, that the legislature of Tennessee intended to sanction such grants as that under which Puckett claims.
 

 In my opinion, this would be a very unsafe ground for this court to rest a decision upon. In looking into the acts of
 
 *338
 
 1806, 1807, and those passed subsequently, it will be discovered that new claims are frequently presenting themselves that had previously escaped the attention of the General Assembly. In the act of 1806, the Legislature specifies many claims for which the commissioners may issue warrants ; it says nothing of claims founded upon grants issued south of French Broad and Holston and west of Big Pidgeon rivers.
 
 ‡
 
 Suppose a suit for the land described in one of these grants, tried prior to the act of 1807, could it, with truth have been insisted that the General Assembly intended to confirm the grantees title to the land granted, as they had made no provision by which a new warrant could be obtained
 
 ?
 
 Surely it could not ; and still there would be a foundation for the argument, in that, if there is a foundation for it in this case.
 

 By the act of 1807, several cases are provided for, which were not noticed in the act of 1806; still the case of a grant from North Carolina and one from Virginia for the same land, is not noticed. Could it have been argued that the legislature it tended to change the situation of either grant by not providing a mode, by which the younger grantee could obtain a warrant ? It is believed not—Many cases might be put, to show, how unjust it would be, to infer that the legislature intended to make good the grant, barely because it provided no mode, by which a new warrant can be obtained. Whoever will attentively examine the acts of 1806 and those passed afterwards, on the subject of laud claims, must discover that the different cases for which it was proper the assembly should make provision, were so numerous that they were not all recollected at any one session, and that those interested are constantly bringing them to their notice. I therefore conclude that this is one of those cases in which the legislature has as yet given no opinion either way unless something is discovered more than the bare omission to provide the means by which a new warrant can be procured.
 

 This brings me to the last argument, used by Puckett’s counsel, and that is, that by the act of 1807,there is an express confirmation of such grants as that of Donelson and Tyrrel — in that section which prohibits the obtaining a grant for
 
 *339
 
 any land already granted, the grant for which is fair upon its face &c.
 

 Whether this section introduces, or was intended to introduce into our laws any new principle, it is not now material to inquire—We ought not however to forget the circumstances of the country at the time it was passed—Until the compact with North Carolina, the records of our titles to lands were in that state. As soon as a copy of them arrived in Tennessee, warrant holders and others, began to search for defects in titles, and if any flaw could be found in the grant or its foundation, no matter how many persons the title passed through, the common idea propagated was, that the land was vacant and liable to be appropriated by a warrant: Hence warrants in some parts of the country, were worth almost as much as land; and the whole country was in a state of confusion (
 
 d
 
 ) In the section under consideration, the assembly prohibit the officers from issuing grants, where the title was on its face fair, and by this means, checked at once, the evil that was prevailing; and no doubt, saved thousands of dollars, that would have been expended in litigation in courts. The consequence of this very section, was, that land warrants immediately fell from two dollars to fifty cents per acre.
 

 Whether this section produced a new principle, or was declaratory of an old one, it seemed essential to the quiet of the country, and I have no doubt, saved more to the citizens of Tennessee, than any one legislative provision ever did.
 

 Still, the question remains, is the grant to Donelson and Tyrrel fair on its face
 
 ?
 
 Whatever defect exists in it, is apparent on its face; the land is granted for military services, as appears from the grant itself. He who would purchase the land, must be supposed to have seen the grant. It therefore appears to me, that this section does not give any aid whatever to this grant ; and that upon the whole there is no fair ground, upon which to distinguish this case from that of Goodloe and Wilson, and therefore this judgment must be reversed (
 
 e
 
 )
 

 
 *340
 
 Whether a possession for seven years, under such a grant, would not, under our statute of limitations, enable a party to hold the land, it is not necessary now to inquire, as no such, question is produced by this record.
 

 *
 

 Absent Overton, J. who did not sit in this cause, being interested in similar question.
 

 (a)
 

 in 1806.
 

 (b)
 

 Ante.
 

 (c)
 

 See the case of Polk vs. Windel & others acc ante.
 

 ‡
 

 In this particular case, the legislature made provision in the year 1806 ; for some other claims no provision was made untill after that session ; cases are incleded in the act of 1807, not contemplated by the act of 1806. The case of grants from N. Carolina and Virginia mentioned in this opinion was not provided for untill 1809—and military claims laid out of the military bounds not provided for until the session of 1815.
 

 d
 

 (d) See the cases of of Weatherhead and Douglas vs. Bledsoe’s heirs and Phillips Lessee vs. Robertson, post: It may also be remarked that Judge White who delivered this opinion, was a member of the legislature in the year 1807, and a member of the land committee.
 

 e
 

 (e) Agreeably to the principle laid down by the S C. U. S. in the case of Polk vs. Wendel and others ante, the military grant was
 
 void for want of authority
 
 in the Governor & Secretary of N. C. to issue a grant for military services out of the military boundary.